IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA                         PLAINTIFF

VS.                    4:13CR00109 JLH

BOBBY HART                                       DEFENDANT

<u>BENCH BRIEF IN SUPPORT OF SUPPRESSION</u>

In support, Defendant states:

I. <u>FACTS IN SUPPORT OF SUPPRESSION</u>

1.    On February 7, 2013, James Wilkins, was a Trooper in the Texas
Highway Patrol Division assigned out of Baytown, a city east of Houston, Texas. (Tr.
4)

2.    At approximately 10:50 p.m., while sitting on the right-hand shoulder
of a three (3) lane interstate, Wilkins testified that he noticed Hart's vehicle brake
while in the middle lane. (Tr. 6)  Wilkins also testified that an eighteen-wheeler, that
was traveling behind Hart, had to adjust its speed in order to not to get too close to
Hart's vehicle. (Tr. 7)

3.    Wilkins testified on direct that he "thought it was odd that the vehicle
would continue to travel at 55 miles an hour after passing me for such a distance."

(Tr. 7)   Wilkins further testified that Hart maintained that speed of travel until he conducted a vehicle stop.   (Tr. 10-11) He further testified that he came to this conclusion because he was "pacing" Hart's vehicle at 55 mph.  Wilkins testimony conflicted with his police report.

4.      His police report indicates that he was never traveling at 55 mph, which would be ten (10) miles below the speed limit.    Instead he indicated that he maintained his speed between 57 and 59 mph until he pulled Hart over.   (Tr. 37) Moreover, Wilkins didn't "pace..." as he testified on direct, but rather used his "radar antenna" to determine Hart's speed prior to the stop. (Tr. 37)  Wilkins acknowledged his testimony was not accurate when compared to his police report.  (Tr. 37)

5.      Wilkins' pursuit of the Hart vehicle began right before an exit ramp (17 seconds), and the vehicle stop was made after the entry ramp on the other-side of the overpass (47 seconds).   (Government's Exhibit 3, DVD)   The exit and entry ramps were accessible to the furthest right lane and identified with several signs as the vehicles approached the on/off ramps.  *Id.*

6.      Upon contact with Hart, Wilkins testified that Hart advised him that he had his cruise control set on 64 mph.  (Tr. 51)   Hart agreed, and testified that he never touched his breaks and maintained that his cruise control was set on 64 mph. (Tr. 58).   Hart further testified that he challenged Wilkins when he stated to him

2

during the stop that he "clocked [him] at 57 miles an hour."   Hart stated, "[t]hat can't be, because I'm on cruise control at 64 miles an hour."  (Tr. 58)   The DVD, entered as government's exhibit 2,  corroborates Hart's challenge.   On tape, Hart confronted the officer that he had his "cruise control" on prior to the stop.  (2:17)

7.    During cross-examination, Wilkins testified that his previous stops for that day would be recorded.  (Tr. 32)[1] Wilkins was asked if Counsel would be able to get the recordings for the other stops that were conducted on February 7, 2013 prior to Hart's stop and he responded, "[y]es, sir."  (Tr. 33)

8.    Counsel inquired as to whether Wilkins dash-mounted camera system could show when its vehicle brakes can come on, and record how fast his vehicle was going at the time leading up to the stop.  (Tr. 45)   Wilkins acknowledged his familiarity with such systems, but denied that his camera system had those options available to him.   Specifically he stated, "[o]urs don't do that.   We don't have that option on ours."   *Id.*

9.    Eight (8) days after the hearing, on August 28, 2014, a subpoena *duces tecum* was sent certified to Sergeant Risch, at the Texas Department of Safety, where Wilkins worked prior to becoming an investigator with CID. (Exhibit 1, Letter)   In

---

[1]    Counsel's request for this information was to further corroborate Hart's version of events leading up to the vehicle stop.

the subpoena, Counsel requested 1) a copy of all video from Wilkins dash-mounted video camera beginning from February 7, 2013 beginning at 0001 hrs and ending on February 8, 2013 at 2300 hrs.   (Exhibit 2, Subpoeana Duces Tecum to Sgt. Risch) Subsequent to his receipt of that subpoena, Risch contacted Counsel's paralegal, Sarah Harrington and was advised that he does not maintain a copy and that it would be with Wilkins.  (Exhibit 3, Affidavit of Sarah Harrington)  Risch also advised that Wilkins drove car D10-3199, a 2010 Dodge Charger, and that the dash-mounted video camera was a "Watchguard Mobile Vision Video System," and that he did not have a copy of any manual associate with the dash cam.   *Id.*   Risch provided Ms. Harrington with Wilkins contact information but advised that Wilkins was on special assignment until September 22, 2014.

8.    On September 24, 2014, a subpoena was prepared and sent to Wilkins by facsimile and U.S. mail, again requesting all videos for the day of February 7, 2013.  (Exhibit 4, cover letter and subpoena to Wilkins)   Wilkins responded the next day via telephone and advised that the videos requested would have been destroyed by THP Baytown Office within 90 days,  according to policy.   Ms. Harrington asked that he send an email outlining his position regarding the subpoena, which is attached as Exhibit 5.    Wilkins email states:

In reference to the subpoena received requesting '[a] copy of ALL

4

dashcam video for all traffic stops made on February 7, 2013 in district 2A04, unit #D10-3199,' the DVD containing all stops during this period of time has been erased or destroyed by the THP Baytown Office due to the 90 day complaint policy established by the Texas Highway Patrol. Generally after a defendant is arrested and charges are filed, a copy of only that particular stop is made from beginning to end and forwarded to the prosecutor's office.    The original DVD containing all traffic stops during that particular time frame is then held by the supervisor for 90 days for any pending complaints by citizens and then destroyed or erased.  (Exhibit 5, Wilkins email, dated September 25, 2014)

9.      As to the dash-mounted video camera system, Counsel researched this system online.    According to that research, the Texas DPS awarded a contract to Watchguard Video on or about November 7, 2006.  (Exhibit 6, WatchGuard new re: Contract)    The system contracted for was a "DV-1" and was going to be retrofitted to "approximately 2,000 State Trooper Vehicles." *Id.*    This system factory default settings allows the system to record, via video, Trooper identifying information, such as his name or badge number; the outside temperature during the recording; when emergency lights/sirens are actuated by the Trooper; when the Trooper applies the vehicle brakes; it allows the officers to record a variety of "radar" speeds, including "target" vehicles; and also the speed of the patrol vehicle by either radar or GPS (in MPH only).  (Exhibit 7, Factory Default Settings out of Watchgaurd Manual) [2]

---

[2]      The link to the manual online is at:
        http://watchguardvideo.com/files/dv1/dv1-user-manual-6-0.pdf

5

II.  ARGUMENT IN SUPPORT

A.  HART'S TESTIMONY WAS MORE CREDIBLE THAN THAT OF TROOPER WILKINS

10.    Counsel for Hart understands that rarely, if ever, does a fact finder believe the testimony of a defendant over that of a law enforcement officer.    Hart is asking the Court to consider doing so here for the foregoing reasons.

11.    Hart's testimony is consistent with what took place on video.    While maintaining his position in the middle lane, Hart testified that he never braked, as alleged by Wilkins.    He further testified that he maintained his speed at 64 miles an hour and that he was aware of his speed because he had his cruise control on.   This testimony was first corroborated by Wilkins testimony who testified that Hart stated to him, upon contact after the vehicle stop, that he had his cruise control set at 64 mph.  (Tr. 51).    Second, the Court should also take into consideration,  when determining the truthfulness in favor of the Defendant, is you is Hart clearly challenging Wilkins that his speed was set on "cruise control."  The audio of the stop at this point was difficult to discern, but you can hear Hart challenging Wilkins assertion as to speed at the 2:17 mark of the DVD.    Third, Wilkins own testimony was in conflict with the police report he prepared soon after the stop.   His testimony was that vehicles passed him, that he "paced" to determine the speed of 55 mph.

6

However, on cross he acknowledged that his report indicated that his speed ranged from 57-59 from the point he left his stationary position until he was pulled over and this conclusion, according to his police report was that "radar" was used, no pacing was ever mentioned.

12.    Wilkins was not truthful with the Court regarding his representations that a video recording of an earlier stop existed.  (Tr. 32)  In fact, Counsel's investigation revealed that a copy of that videotape would be available only through Trooper Wilkins, but when subpoenaed about the video, he recited in some detail a policy that suggested the tape recording was likely destroyed 90 days after the stop.    Wilkins knew why Counsel was asking – he wanted to further attempt to corroborate the story of his client, Hart.    However, when it was asked for he pointed to a policy that showed it was likely destroyed.   More interesting, is that he states that the tape was likely destroyed by the same Trooper unit that was advising Ms. Harrington that the recording was in the possession of Wilkins.   Risch said Wilkins had it, Wilkins stated that the "THP Baytown Office" destroyed it.   The two stories do no make sense and should case doubt on the credibility of Wilkins.

13.    Wilkins representations to the Court about the capabilities of his dash-mounted video camera were also untrue.   He was asked directly whether his camera was capable of recording his unit's speed, braking, and lighting.   Although he was

familiar with systems that are capable of this he stated, "[o]urs don't do that.   We don't have that option on ours." (Tr. 45)   This is not true!   Not only does the system, used by Texas DPS since November 7, 2006, allow the recording of the unit's speed, lights, and brakes, as asked by Hart at the hearing, but it also allows the user to record allows the system to record Trooper identifying information, outside temperature, when emergency lights/sirens are actuated, and  it allows the officers to record a variety of "radar" speeds, including "target" vehicles; and also the speed of the patrol vehicle by either radar or GPS (in MPH only).   (Exhibit 7, Factory Default Settings out of Watchgaurd Manual)     This information, if put on the recording provided, would have definitively determined who was truthful about the events that unfolded on February 7, 2013.    Instead, by not putting the information in the recording, the Court now has to rely upon an officer who, at best, was not forthcoming to the Court or the parties in this matter.

14.    Officers, on occasion, do lie.   It appears that Wilkins has done so on several occasions during his testimony at the August 20, 2014 hearing.     Hart is cognizant that the Court's finding "regarding the credibility of...two witnesses is virtually unreviewable upon appeal...," *United States v. Granados,* 596 F.3d 970, 976 (8th Cir. 2010)  For this reason, Hart is praying that the Court take into consideration Wilkins and Hart's testimony and make the determination that Hart's version of

events is accurate and corroborated by the record.

B.    THE GOVERNMENT FAILED TO ESTABLISH THAT HART'S VEHICLE WAS "MOVING MORE SLOWLY THAN THE NORMAL SPEED OF OTHER VEHICLES AT THE TIME AND PLACE UNDER THE EXISTING CONDITIONS" WHILE IN THE MIDDLE LANE OF A THREE-LANE INTERSTATE.

"An operator on a roadway of sufficient width shall drive on the right half of the roadway, unless...the operator is on a roadway divided into three marked lanes for traffic." Tx. Traf. Code 545.051(a)(3).    The section further provides that, "[a]n operator of a vehicle on a roadway moving more slowly than the normal speed of other vehicles at the time and place under the existing conditions shall drive in the right-hand lane available for vehicles..." Tx. Traf. Code 545.051(b) (emphasis added)

Wilkins testified that the only other traffic that was at the time and place was a eighteen-wheeler that was traveling behind Hart when he passed his vehicle.   If believed, Wilkins testimony was that Hart applied his brakes and the eighteen-wheeler adjusted his speed accordingly.   Then after the vehicles pass him, Wilkins moved from his stationary position on the right had side of the road.    There was no further testimony that Hart was not moving "more slowly than the normal speed of other vehicles."    Indeed, the only vehicle moving at that the same place and time as Hart, was the eighteen-wheeler.   The only testimony that this eighteen-wheeler was moving faster than Hart was from Wilkins, but the DVD shows there was no "slower

vehicle" on the road.    To the contrary, the vehicles on video appears to be moving at the same exact speed, with Hart in front.    During the course of the video, there appears to be no change in speed of either of the vehicles.    As acknowledged by Wilkins, if the eighteen-wheeler was traveling at a greater speed he/she had the option to moving to either the left or right hand lanes available to him to make a pass. Instead the truck remained behind Hart, maintaining its speed, never gaining on Hart's vehicle.    What appears on video, which Wilkins represented to be the entirety of what he saw after the vehicles passed, shows two vehicles moving at the same pace, not more slowly than each other.

The government had the burden to show that Hart's vehicle was traveling "more slowly" than other vehicles that were at the traveling at the "time" and "place" of Hart's vehicle.    Wilkins testimony should not be believed.    The objective evidence shown in the DVD establishes that Hart was moving not "more slowly" than the eighteen-wheeler.    Therefore, Hart did not violate Tx. Traf. Code  545.051(b). Hart was in an appropriate lane according to Tx. Traf. Code 545.051(a).    Wilkins had no basis, whether reasonable suspicion or probable cause, for the stop of Hart's vehicle.

C.    CONCLUSION

The vehicle stop and subsequent search violated the Fourth Amendment.    The

stop was without reasonable suspicion or probable cause and everything inculpatory was fruit from the unlawful search.

WHEREFORE, Hart prays that the evidence be suppressed pursuant to the Fourth Amendment to the U.S. Constitution.

Respectfully submitted,

/s/ Patrick J. Benca
PATRICK J. BENCA
  Ark Bar No. 99020
BENCA & BENCA
1311 Broadway
Little Rock, AR 72202
(501)371-9131
(501)378-0888   fax
E-mail: pjbenca@aol.com

*Attorney for Defendant*

### CERTIFICATE OF SERVICE

I, Patrick J. Benca, certify that the foregoing was filed using the CM/ECF System, which will cause Chris Givens, AUSA, to be served on November 19, 2014.

/s/Patrick J. Benca
PATRICK J. BENCA

11